IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 17-0058-CG-N |
| $63,788.00 MORE OR LESS IN UNITED STATES CURRENCY | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the United States' motion for summary judgment (Doc. 26), the response in opposition filed by Claimant, Hjordis Blackmon (Doc. 29), Claimant Blackmon's motion to strike (Doc. 30), and the United States' reply (Doc. 31). For the reasons explained below, the Court finds that the motion to strike should be denied and the motion for summary judgment should be granted.

## I. FACTS

This is a civil action for forfeiture, pursuant to 21 U.S.C. § 881(a)(6), of $63,788.00 in U.S. currency that was seized on September 9, 2016 by a Mobile County Sheriff's Office deputy during a search warrant execution at the Longleaf Pines Apartments, Apartment 1322, 6190 Girby Road, Mobile, Alabama. Hjordis Blackmon filed a claim of interest asserting that the monies in question are his personal property. (Doc. 5). Claimant Blackmon does not dispute the following facts that the United States alleges led to the search and seizure:

1. In January 2016, a Louisiana State Police Trooper pulled over a Toyota Camry for a traffic violation as it traveled East on Interstate 12 in Tangipahoa parish. Its driver, Ashley Newton, said she was traveling from Houston, Texas to Mobile, Alabama. A consensual search of Newton's car revealed approximately 2.96 kilograms of cocaine inside a backpack.

2. The Louisiana State Police brought Newton to the Mobile DEA office for questioning by DEA Special Agents about her involvement in drug trafficking. Newton discussed the drug conspiracy and the roles of co-conspirators, Marcus and Ann Dooms. Newton made drug runs "[o]nce a week" for "2 months" and would "deal directly with Ann and Marcus." Newton would get a call from Ann Dooms, meet her at a location in Mobile, and retrieve a bag of money. Newton would then take the money to Marcus Dooms in Houston, Texas. Marcus Dooms would then take the money and call her later that day to pick up the cocaine for her to transport back to Mobile.

3. Newton called Ann Dooms to establish a place and time to conduct a controlled delivery of cocaine to Dooms, who agreed to meet Newton at a Mobile Walmart parking lot. DEA agents gave Newton the backpack that contained two sham cocaine bricks simulating the nearly three kilograms of cocaine she had been caught with and a third sham brick that had a small amount of cocaine hidden in it. Trailed by agents, Newton drove away in her Camry with the backpack to the meeting location where Ann Dooms waited inside her Cadillac CTS. Newton parked beside her, got the backpack, walked over to Ann Dooms' car, opened the car door, and placed the backpack in Dooms' car. Following the successful delivery to Dooms, Newton returned to her Camry and drove away.

4. Ann Dooms also drove away and agents followed her to a restaurant. An agent went inside, identified himself to Dooms, and asked her to step outside. The agent explained to Dooms that the package that she had picked up from Newton belonged to the DEA and that it was investigating the transportation of cocaine. The backpack that Newton delivered to Dooms was on the back seat of Dooms' car. The agent further explained that the Mobile County Sheriff's Office (MCSO) had obtained a search warrant for her home, and Dooms agreed to return to her home during its execution.

5. At Dooms' Mobile residence, MCSO Deputy McClain read Dooms her Miranda rights, and Dooms agreed to speak with the Deputy. Dooms said that she had been receiving cocaine but did not know how much. Dooms said that when she

received cocaine she would contact her son, Marcus Dooms, in Houston, and Marcus would call cocaine dealers in Mobile, who in turn would come to her house to pick up the cocaine. Ann Dooms had distributed cocaine at least three or four times over the past few months. She also collected money from the dealers. Once she had received the payments, she would contact Ashley Newton, and then meet her and deliver the money. Newton would then take the money to Marcus in Houston.

6. Ann Dooms delivered kilograms of cocaine to a lighter complexioned black male who identified himself to her as "Yellow", whom she later learned is Howard Pompey, Jr. She first met "Yellow" at her house in November or December 2015 after he called her on her cell phone and said he needed to pick "it" up. She delivered to "Yellow" a backpack or plastic bag that Ashley Newton had recently delivered to her from Marcus that she understood contained cocaine. "Yellow" came to her house twice to make such pick-ups. Following the deliveries to "Yellow", she received calls from "Yellow" to meet him for him to deliver money to her and ultimately to Ashley Newton and Marcus. She met "Yellow" in a store parking lot near her home where he delivered money to her that was bundled with different-colored rubber bands and vacuum-sealed or wrapped in tape. "Yellow" drove a dark-colored SUV. Ann Dooms would then deliver the money to Ashley Newton for delivery to Marcus.

7. Marcus Dooms met Howard Pompey, Jr., who also goes by "Yellow", in 2012 or 2013. Dooms' girlfriend at the time, Ashley Newton, introduced them. Dooms bought high-grade marijuana from "Yellow" and he sometimes sold "Yellow" marijuana, too. In about 2014, Howard/"Yellow", began to buy cocaine from Dooms. The first time he sold "Yellow" cocaine "Yellow" gave Dooms about $16,000 for a ½ kilogram of in the driveway of Dooms' home. Dooms continued to sell cocaine to "Yellow" at a rate of one to two kilograms per week ($32,000-$64,000 worth) for months at a time up to when Ashley Newton was caught in January 2016. Dooms knew that he was not the only cocaine supplier for "Yellow" because "Yellow" introduced him to another Houston dealer from whom he bought some Promethazine, also called codeine syrup, and shared it with "Yellow". At one point, "Yellow" wanted to get 10 kilograms of cocaine (about $250,000 worth) which Dooms did not have the ability to supply. The most Dooms could have gotten someone to front to him was about $150,000 worth.

8. Before Ashley Newton was caught, Dooms went to the apartment where "Yellow" was living on Girby Road three to

3

four times. Dooms and "Yellow" would smoke some weed and play video games, and "Yellow" was always paying him money for cocaine. The money would be folded and rubber-banded together in $1,000 stacks and $5,000 bundles. Sometimes it would be vacuum-sealed.

9. In about May or June 2016, Marcus Dooms met with "Yellow" and he wanted to buy cocaine from Dooms again. "Yellow" complained that the other Houston dealer could not keep up with his demand. He mentioned something about Deputy McClain saying I had "got him" ("Yellow") and Dooms decided he needed to stop dealing with him for the time being. Dooms has never known "Yellow" to have a legitimate job.

(Doc. 27, pp. 1-5 (footnotes and citations omitted)).

Claimant Blackmon lived in the Longleaf Pines Apartment 1322 but moved out around July 2016, before the search was executed on the apartment. (Doc. 27-7, p. 10-11). Blackmon testified that he had to move out because his mother broke her hip and he moved with her to what had been his grandmother's house. (Doc. 27-7, p. 10). Blackmon testified that he was "back and forth," but he spent most of his time taking care of his mother and he had to be there to give his mother her medicine and to check her sugar in the morning and at night. (Doc. 27-7, p. 11, 12). Blackmon still had clothes in the apartment, but he was at his mom's house more than he was at the apartment then, "when she's there, [he is] there." (Doc. 27-7, p. 30). According to Blackmon, his godson, Howard Pompey, moved in with him to Apartment 1322 about three to six months before Blackmon left. (Doc. 27-7, pp. 18, 30-31). Blackmon testified that although Pompey had his own key and could come and go at will, he was not coming in Blackmon's room, because that was off limits. (Doc. 29, pp. 30, 49). Blackmon testified that he sees Pompey about twice a week because Blackmon goes to check on Pompey's mom who's not in the best of health

4

and Pompey will sometimes pass by Blackmon's house and he will stop him or they will be over by the park playing. (Doc. 27-7, p. 22).

On two separate occasions in late August 2016, Sheriff's Deputy John McClain surveilled Longleaf Pines Apartment 1322 and saw Pompey drive out of and return to the apartment's garage in a black SUV registered to him. (Doc. 31-1, p. 2). McClain did not see Blackmon coming from or going into the apartment during the surveillance. (Doc. 31-1, p. 2). On September 9, 2016, McClain and other members of the Mobile County Sheriff's Office (MCSO) Narcotics Unit executed a search warrant at Apartment 1322. (Doc. 31-1, p. 3). After knocking and announcing and receiving no response, the deputies forced open the door. (Doc. 31-1, p. 2). The deputies found Pompey in the living room of the apartment. (Doc. 31-1, p. 2). The deputies found hydroponic marijuana, codeine, and illegal prescription drugs, $42,900 of vacuum-sealed cash in the pocket of a jacket hanging in the master bedroom closet, $18,120 in folded and rubber-banded cash in the master bedroom nightstand drawer, $2,617 in cash on the living room couch and another $105 and $146 in the master bedroom closet. (Doc. 31-1, pp. 3-4). The total U.S. Currency seized was $63,788. (Doc. 31-1, p. 5). When the deputies asked about securing the apartment door, Pompey said Blackmon would take care of that, that he lived somewhere off Moffett Road. (Doc. 31-1, pp. 3-4). Blackmon confirmed in testimony that Pompey said that because Blackmon would go for "booty calls" to a house off Moffett where a girl he was seeing lived, but testified that he was staying at his mom's house which was also off Moffett Road. (Doc. 27-7, pp. 32-33).

5

Pompey was arrested and he was sent notice of his right to file a claim, but he did not file a claim. Blackmon filed a claim, but listed Pompey's mother's address on the claim form. (Doc. 27-7, pp. 23-25). Blackmon claims $60,000 of the money represents distributions from a trust, the Arthur C. Blackmon trust, of which he is the beneficiary. (Doc. 27-11, ¶ 2). Blackmon states that some of the money may have come from his salary from working at the Mobile Beacon Inc. (Doc. 27-11, ¶ 2).

Blackmon received $30,000 from the trust on December 3, 2012. (Doc. 27-12, pp. 1, 2; Doc. 27-7, p. 26). Blackmon testified that he spent some of it on an apartment for his "other girlfriend" and a car for "the other kid" and an apartment for his "last baby moma" and a swing set for "the kid." (Doc. 27-7, p. 27). After those expenditures, Blackmon was left with $18,000.[1] (Doc. 27-7, p. 27). Between 2013 and 2015, Blackmon received $10,000 a year for a total of $30,000 from the trust. (Doc. 27-12, pp. 3-8). Blackmon did not receive the next distribution from the trust until October 2016, after the money at issue was seized. (Doc. 27-12, pp. 9-10).

Blackmon testified that prior to receiving the trust money in 2012, he was on food stamps. (Doc. 27-7, p. 7). Blackmon testified that he made about $1,000[2] per

---

[1] Blackmon initially testified he was left with about $15,000, but then decided it was $18,000.

[2] Blackmon argues that his deposition testimony concerning this fact is unclear and that it should be construed in his favor. When asked how much money he made in a year, Blackmon answered that he "might have made about – maybe a thousand – maybe a thousand dollars, a hundred dollars or something like that a month, something like that." (Doc. 27-7, p. 7). Blackmon contends that his answer could be interpreted to mean he made a thousand dollars a month. However, the answer was in response to how much he made a year to which he first responded "maybe a thousand." He then appears to have explained or rationalized further the basis for that calculation. Moreover, in a follow up question counsel confirmed that amount.

6

year doing odd jobs and in addition made about $500 per year from the Mobile Beacon. (Doc. 27-7, pp. 7-8). Blackmon also had gambling winnings of $1,400 one night in 2016 and $975 in 2014 and testified that he guesses he came out ahead, he might be up three, four or five thousand at the end of the year. (Doc. 27-7, pp. 17-18). Blackmon has not been filing income tax returns because they don't take taxes from his trust inheritance and the other money he received in cash. (Doc. 27-7, p. 9).

According to Blackmon, his living expenses were between $1,705 and $1,755 per month in 2014, they were the same in 2015, and they went up to between $1,805 and $1,955 per month in 2016. (Doc. 27-13, p. 10). Blackmon testified that his expenses in 2012 and 2013 would have been the same as in 2014. (Doc. 27-7, pp. 15-16).

## II. MOTION TO STRIKE

Claimant Blackmon moves to strike paragraphs 11 through 19 and 21 of the United States' summary judgment motion because they contain factual statements that cite to the verified complaint in this case. Blackmon argues that the verified complaint is not a valid source because it was not verified by someone that had personal knowledge of those facts. In response, the United States submitted the declaration of Deputy John McClain, who avers that he has personal knowledge of

---

Counsel asked Blackman: "Okay. And you gave me about a thousand dollars a year as a figure of the money that you were earning during that same period. Does that include the money you were making at the newspaper or is that more money?" Blackmon did not disagree or attempt to correct counsel and instead simply answered: "That'd be more money." (Doc. 27-7, p. 8).

the facts. (Doc. 31-1). The Court will consider the facts only to the extent they are supported by McClain's affidavit or Blackmon has conceded that they are not disputed.[3] Accordingly, the Court finds the motion to strike is due to be denied as moot.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a

---

[3] Blackmon concedes that there is no dispute as to the facts contained in paragraphs 17, 20, 21 and portions of 18. (Doc. 29, p. 6).

jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere

9

'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

**B. Forfeiture Claim**

The Complaint alleges that the Defendant, $63,788.00, more or less, in United States Currency, is subject to forfeiture in rem pursuant to the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 802, 881(a)(6). (Doc. 1). Section 881(a)(6) provides for the forfeiture of moneys and other things of value furnished or intended to be furnished by any person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate any violation of the CSA. When, as here, the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or that it was involved in the commission of a criminal offense, the Government shall establish by a preponderance of the evidence that there was a "substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

> The Government need not, however, prove that the money is traceable to a specific transaction in illicit drugs; it need only prove by a preponderance of the evidence that the money is substantially connected to drug trafficking generally. *See United States v. $118,170.00 in United States Currency*, 69 Fed.Appx. 714, 717 n. 1 (6th Cir.2003)(unpublished opinion). Additionally, "[t]he government may use both circumstantial evidence and hearsay, [to show a substantial connection between property and the offense] and the district court should evaluate the evidence presented with a common sense view to the realities of normal life." *United States v. 3402 53rd St. W. Bradenton, FL*, 178 Fed.Appx. 946, 947 (11th Cir.2006)(internal citations omitted).

*United States v. $52,000.00, More or Less, in U.S. Currency*, 508 F. Supp. 2d 1036, 1040 (S.D. Ala. 2007).[4]

This forfeiture proceeding was initiated after the April 2000 effective date of the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C.A. § 983; therefore, the procedures set forth in CAFRA apply. "The provisions of CAFRA materially altered

---

[4] The cited passage states that the government may rely on hearsay evidence, but the Court notes that in other cases in this Court, this Court has stated that "the United States is no longer permitted to use hearsay evidence." *See e.g. United States v. One 1991 Chevrolet Corvette*, 390 F. Supp. 2d 1059, 1065 (S.D. Ala. 2005) (citing *United States v. Certain Real Prop. Located at 263 Weatherbrook Lane, Anniston, Alabama, known as ""The Platinum Club"*, 202 F. Supp. 2d 1275, 1276 (N.D. Ala. 2002)). There appears to be little consensus among the courts in this circuit on this issue. *See e.g. United States v. $11,320.00 in U.S. Currency*, 880 F. Supp. 2d 1310, 1325 (N.D. Ga. 2012) ("The Government may use both circumstantial evidence and hearsay to satisfy its burden of proof." (citations and internal quotations omitted)); *United States v. $19,054.00 in U.S. Funds*, 2012 WL 4094361, at *3-4 (M.D. Ga. Sept. 17, 2012) (finding that prior to CAFRA, the government could rely on a broad range of evidence, including hearsay, to establish probable cause, but that much of that evidence would be inadmissible now and stating that "[a]lthough the Eleventh Circuit has not yet squarely addressed this issue, the Fifth Circuit has." (citing *United States v. $92,203.00*, 537 F.3d 504 (5th Cir. 2008)); *United States v. One 2007 Toyota FJ Cruiser, VIN JTEBU11F670023522*, 824 F. Supp.2d 1369, 1377 (N.D. Ga. 2011) ("To satisfy its burden, [t]he government may use both circumstantial evidence and hearsay" (internal quotations omitted)); *United States v. 4 Meadowbrook Lake Condo., Unit 308, Condo. No. 8, Located at 314 SE 10th St., Dania, FL 33004*, 2007 WL 809681, at *3 (S.D. Fla. Mar. 15, 2007) ("The evidence relied on by the Government must be admissible, non-hearsay evidence.").
The Eleventh Circuit stated in a post-CAFRA case that "[t]he government 'may use both circumstantial evidence and hearsay.'" *United States v. $291,828.00 In U.S. Currency*, 536 F.3d 1234, 1237 (11th Cir. 2008) (quoting a pre-CAFRA case: *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1440 (11th Cir.1991)). In the instant case, the Court concludes that the Government's burden has been met without considering any disputed hearsay evidence. Thus, the issue here is moot.

11

the various burdens of proof in civil forfeiture actions filed in federal courts." *$52,000.00,* 508 F. Supp.2d at 1039 (citation and internal quotation omitted). "Under CAFRA, 'the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture....' " *Id.* (quoting 18 U.S.C. § 983(c)(1)). "The Government may use evidence gathered after the filing of a complaint for forfeiture to meet its burden." *Id.* (citing 18 U.S.C. § 983(c)(2)). "Once the Government has met its burden, the burden then shifts to the claimant to prove by a preponderance of evidence a defense to the forfeiture or to prove that the property is not otherwise subject to forfeiture." *Id.* (citations omitted). This Court has previously explained these burdens in the summary judgment context as follows:

> The Government, as the party moving for summary judgment, bears the initial burden of demonstrating the absence of a genuine issue of material fact. This summary judgment standard dovetails with the standards set forth in CAFRA to provide that where the government meets its initial burden to show by a preponderance of the evidence that the property subject to forfeiture was substantially connected to drug trafficking, the burden shifts to the Claimant to demonstrate a defense to the forfeiture or to prove that the property is not otherwise subject to forfeiture. Where the Government has met its burden by a preponderance of the evidence, and the Claimant fails to sustain his burden, the entry of summary judgment is proper as no genuine issue of material fact remains to preclude the entry of summary judgment.

*$52,000.00,* 508 F. Supp.2d at 1041.

In the instant action, the Court finds that the United States has sustained its initial burden of showing by a preponderance of the evidence that the property was substantially connected to drug trafficking. The Defendant currency, $63,788.00, is a large amount of cash. "Courts have recognized that, for purposes of a civil

forfeiture action, the possession of a large sum of currency is strong evidence of narcotics trafficking." *United States v. $22,991.00, more or less, in U.S. Currency*, 227 F. Supp. 2d 1220, 1232 (S.D. Ala. 2002) (citations omitted). Pompey was selling a significant volume of cocaine, even seeking to buy 10 kilograms, worth $250,000, at one point. Such high-volume sales would generate and require a substantial amount of cash. And most of the cash was found vacuum-sealed in the pocket of a jacket or folded and rubber-banded in the nightstand drawer. Money from legitimate business is not usually transported or stashed in large quantities of cash in vacuum sealed bags or rubber-banded into bundles in a jacket pocket or nightstand drawer. *See United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities."). Securing the cash in vacuum-sealed bags and with rubber-bands is consistent with the way cash was handled during Pompey's drug transactions.

Another factor supporting a connection between the currency and drug trafficking is that illegal drugs were found in the same apartment. The proximity of the currency to drugs itself can be highly probative circumstantial evidence of a link between the cash and illegal drug activity. *Id.* at 1233. Additionally, the amount of the currency, $63,788.00 is the approximate street value of two kilograms of cocaine and Marcus Dooms sold cocaine to Pompey at a rate of one to two kilograms per

week ($32,000-$64,000 worth). "Such is probative evidence that the [$66,788.00] in question either was intended to be used to purchase [two] kilo[s] of cocaine, or already had been received in exchange for [two] kilo[s] of cocaine. *Id.* at 1234.

Lastly, the absence of a legitimate origin of the defendant currency, considered together with the other evidence presented, suggests a "substantial connection" between the currency and the drug trade. "In civil forfeiture cases, the absence of an apparent, verifiable, or legitimate source of substantial income is probative evidence of a substantial connection to illegal activity." *$52,000.00,* 508 F. Supp.2d at 1042 (citations omitted). Pompey, who resided at the apartment where the currency was found, dealt with large amounts of money in connection with his illegal drug activities. Marcus Dooms stated that he had never known Pompey to have a legitimate job. Blackmon contends that the currency originated from his trust fund and other income. However, Blackmon's own account of his income and expenses demonstrate that at the time the currency was seized in September 2016, he would not have had any money. Blackmon had no discretionary income prior to receiving money from his trust fund in December 2012 as he was on food stamps. In December 2012, he started receiving payments from the trust fund, with the first payment amounting to $18,000 after he spent money on items for his girlfriends and children. He received a total of $30,000 more from the trust fund, before the seizure. Thus, Blackmon's relevant income from the trust fund totaled $48,000. He also reports receiving $1,000 per year from odd jobs, resulting in a total amount

14

from 2013 through 2016[5] of $4,000. He reports having earned $500 per year from Mobile Beacon, which would total $2,000 from 2013 through 2016. He also reports yearly gambling net income of three, four or five thousand, which, using his highest estimate of $5,000, would total $20,000 from 2013 to 2016. Adding all of his income beginning with his first trust payment in December 2012 through September 2, 2016, the Court calculates his relevant income to total $74,000.

A review of Blackmon's reported expenses, demonstrates that his expenses exceeded his income during the relevant time period. In 2013, he reports living expenses of between $1,705 per month to $1755 per month. If, for the sake of argument, we calculate his expenses for that year using the lowest figure, his expenses for 2013 total $20,460. His expenses were the same in 2014. In 2015, his expenses went up to between $1,805 and $1,955 per month. Using the lower figure again, his expenses for 2015 would amount to $21,660. Blackmon's expenses were the same in 2016, however, the currency in question was seized on September 2, 2016, thus Blackmon would have only had eight months of expenses in 2016 prior to the seizure. Using the lower figure of $1,805 per month, Blackmon's expenses for 2016 prior to the seizure totaled $14,440. Adding up all of these amounts, Blackmon's expenses from January 2013 until the seizure in 2016 totaled $77,000.[6]

---

[5] The currency was seized on September 2, 2016, prior to the end of the year, but looking at the evidence in the light most favorable to Blackmon, the Court will presume his earnings were the same as for an entire year. The Court follows this same rational to calculate Blackmon's Mobile Beacon and gambling income. There is no evidence indicating what time of year he typically earned the income or whether the income was spread out equally throughout the year.
[6] The Court notes that it did not include expenses from December 2012 in this

15

Thus, looking at Blackmon's reported income and expenses in the light most favorable to him, he did not have enough income to cover his expenses, much less amass savings of $60,000 or more.

In light of the above, the Court finds that the United States has met its burden of establishing by a preponderance of the evidence that that the Defendant currency is substantially connected to drug trafficking. The Court also finds that Claimant Blackmon has failed to demonstrate a defense to the forfeiture or to prove that the property is not otherwise subject to forfeiture. Accordingly, summary judgment should be granted in favor of the United States.

**IV. CONCLUSION**

Fort the reasons stated above, Claimant Blackmon's motion to strike (Doc. 30), is **DENIED as MOOT** and the United States' motion for summary judgment (Doc. 26), is **GRANTED.**

**DONE** and **ORDERED** this 3rd day of April, 2018.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

---

calculation since the Court also did not include any regular income from that month. If Blackmon's reported income from odd jobs, employment at the Mobile Beacon, and gambling income from that one month were included, such income would amount to approximately $542 ($1,000 + $500 + $5,000 divided by 12). Blackmon's monthly expenses at that time were $1,705, resulting in an additional shortfall of $1,163.